NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 87

No. 2016-032

| | |
|---|---|
| In re North East Materials Group LLC Act 250 JO #5-21 (Russell Austin, Pamela Austin, Julie Barre, Marc Bernier, et al., Appellants) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | May Term, 2016 |

Thomas G. Walsh, J.

Laura B. Murphy and Douglas A. Ruley, Environmental and Natural Resources Law Clinic, South Royalton, for Appellants.

Alan P. Biederman of Biederman Law Office, and James P.W. Goss of Facey, Goss & McPhee, P.C., Rutland, for Appellees North East Materials Group and Rock of Ages.

William H. Sorrell, Attorney General, and Gavin J. Boyles, Assistant Attorney General, Montpelier, for Amicus State of Vermont.

PRESENT: Dooley, Skoglund, Robinson and Eaton, JJ., and Pineles, Supr. J. (Ret.), Specially Assigned

¶ 1. **DOOLEY, J.** This case is here for the second time, following the Environmental Division's decision on remand that a rock-crushing operation by North East Materials Group, LLC, (NEMG) is exempt from Act 250 as a preexisting development. The Environmental Division reached the same conclusion in its first decision, but we reversed and remanded, holding that the court used the wrong legal standard in deciding that the rock-crushing operation did not constitute a cognizable physical change to the preexisting development and that one of the main factual findings in support of the decision was clearly erroneous. In re North East Materials Grp. LLC Act 250 JO #5-21, 2015 VT 79, __ Vt. __, 127 A.3d 926 [hereinafter NEMG I]. Appellants, a

group of thirteen neighbors (neighbors), appealed, arguing that the Environmental Division erred in applying our instructions on remand. We now conclude that, even assuming that crushing operations were part of the preexisting quarrying development, findings on the location and volume of the crushing operations are too limited to support a conclusion that the present operations do not constitute a cognizable change to the existing development. We reverse.

¶ 2. As an overview, the issues in this case are: (1) whether rock crushing was conducted on the tract prior to July 1, 1970, the effective date of Act 250, such that rock crushing is grandfathered-in and accordingly, no Act 250 permit is required; (2) whether the activity was abandoned such that its renewal requires an Act 250 permit; and (3) whether there has been a substantial change in that activity such that an Act 250 permit is required. These issues arise in a special context—the rock crushing before us is conducted on a relatively small part of a large tract of land owned by Rock of Ages (ROA), which is used primarily for granite quarrying. In general, NEMG has argued that activities anywhere on the ROA land count in determining whether rock crushing is grandfathered-in, whether rock crushing has been abandoned and whether there has been a substantial change in the rock-crushing activity; the Environmental Division accepted this position in its first decision. Neighbors, on the other hand, have argued that only activities conducted on the NEMG rock-crushing site should count in determining the three issues. Also in general, our decision accepted NEMG's argument with respect to whether rock crushing activity was grandfathered-in, but accepted the neighbors' argument with respect to substantial change; the second part of the decision caused the partial remand. As detailed below, the Environmental Division again effectively accepted NEMG's arguments, but changed the rationale with respect to substantial change. Neighbors argue here that the new rationale is inconsistent with our first decision and must be reversed. NEMG argues that the new rationale is fully consistent with our first decision and must be affirmed. Thus, the main question we must decide is whether the new rationale, accompanied by some new findings of fact, can support the conclusion that there has been no substantial change.

2

¶ 3. We will not repeat the facts as first found by the Environmental Division. These are contained in our first decision, and the reader is invited to read them there. See NEMG I, ¶¶ 2-9. To the extent that additional findings relate to the issues before us, we consider them with our discussion of these issues.

¶ 4. Before we look at NEMG I and the subsequent decision of the Environmental Division, we examine the legal principles that govern that case. As we noted above, development begun before June 1, 1970, the effective date of Act 250, does not require a permit. Id. ¶ 15. This exemption, however, is limited by the caveat that "any substantial change in such excepted subdivision or development" is subject to the ordinary permit requirement. 10 V.S.A. § 6081(b). A "substantial change" is defined as "any change in a preexisting development . . . which may result in a significant adverse impact with respect to any of the [ten Act 250 criteria]." Act 250 Rules, Rule 2(C)(7), Code of Vt. Rules 12 004 060-3, https://perma.cc/72EL-9ZSW. The Environmental Board has established a two-pronged test to determine if a new development constitutes a substantial change, and this Court has repeatedly upheld that test. See In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10, 181 Vt. 589, 925 A.2d 1006 (mem.). Under the test, we first look to determine if a cognizable change to the existing development will result from the project in question. If so, we go on to determine whether the change has the potential for significant impact under any of the Act 250 criteria in 10 V.S.A. § 6086(a). Id. (citing Sec'y, Vt. Agency of Nat. Res. v. Earth Constr., Inc., 165 Vt. 160, 164, 676 A.2d 769, 772 (1996)). Even a modest change may be considered a cognizable change. NEMG I, 2015 VT 79, ¶ 31 (citing In re Vt. RSA Ltd. P'ship., 2007 VT 23, ¶ 11). A thing is cognizable as long as it is "capable of being known or recognized." Black's Law Dictionary (10th ed. 2014). This indicates that a change should be considered cognizable as long as it is notably distinct from whatever preceded it.

¶ 5. Any party seeking an exemption from Act 250 jurisdiction on the basis of a pre-existing development commenced before 1970 has the burden of providing evidence sufficient to demonstrate the existence and nature of the pre-existing development. In re Request for

3

Jurisdictional Op.(F-35A Case), 2015 VT 41, ¶ 26 n.7, 198 Vt. 510 117 A.3d 457 (citing In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10). Once a development has been established as exempt from Act 250 jurisdiction, any party seeking to subsequently impose jurisdiction has the burden of showing that there has been a substantial change to the preexisting development. Id. However, the burden is still on the holder of the exemption to provide sufficient information on pre- and post-1970 operations to allow the finder of fact to ascertain if a substantial change has occurred. In re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, slip. op. at 14 (Vt. Envtl. Bd. Aug 30, 1999), https://perma.cc/2UKV-FRSP (finding party invoking exemption must "produce information concerning the scope of pre-1970 operation and the post-1970 operation sufficient for the Environmental Board to determine whether a substantial change has occurred" (citation omitted)). This is because the owner or operator of the development is far more likely to have historic knowledge of the site, and it is far more practicable for them to produce this evidence than a plaintiff with no personal knowledge of their operations. To place the burden of providing historic economic evidence wholly on the party seeking jurisdiction would prevent many parties from bringing suit, effectively shutting out local interests that Act 250 was designed to enfranchise. In re Barefoot Act 250, No-46-4-12, Vtec, at 5 (Vt. Envtl. Ct. April 5, 2013), https://perma.cc/CNK8-SQ6D (recognizing "long-standing principles of encouraging public participation in state and local land-use deliberations"); In re Lathrop Ltd. P'ship I, No. 122-7-04 Vtec, at 2 2014 WL 860823, at *1 (Vt. Envtl. Ct. Feb. 11, 2014), https://perma.cc/6GYG-UNUX (stating public participation is "woven into" Act 250).

¶ 6.    Moreover, the absence of either historic or current evidence does not relieve the party seeking an exemption of their burden of production either in demonstrating the existence of a preexisting development or defending against imposition of jurisdiction based on substantial change. See In re Orzel, 145 Vt. 355, 359, 491 A.2d 1013, 1015 (1985) ("The Board cannot determine whether some activity constitutes a substantial change to a pre-existing operation unless it is made aware of what that activity is."); In re John Gross Sand & Gravel, Declaratory Ruling

4

No. 280, slip op. at 11 (Vt. Envtl. Bd. July 28, 1993), https://perma.cc/J42M-N4YQ ("[T]his situation does not excuse the Petitioner from meeting its burden of production.").

¶ 7. On remand, the lower court is bound by the scope of our remand instructions, and may only reopen issues that are within that scope. In re Twenty-Four Vt. Utils., 159 Vt. 363, 367, 618 A.2d 1309, 1311 (1992). Furthermore, the lower court is bound to follow the specific instructions given by this Court, interpreted in the light of the opinion. Coty v. Ramsey Assocs., 154 Vt. 168, 171, 573 A.2d 694, 695 (1990) (citing Halpern v. Kantor, 139 Vt. 365, 367, 428 A.2d 1132, 1134 (1981)). It is error for the lower court to pursue and rely on findings or reasoning that this court has already struck down. Cleverly v. Cleverly, 151 Vt. 351, 354, 561 A.2d 99, 100 (1989) (citing Isabelle v. Proctor Hosp., 132 Vt. 243, 245, 315 A.2d 241, 243 (1974)). The purpose of the mandate is to ensure closure—if parties are allowed to reintroduce rejected arguments, and courts are allowed to reapply rejected logic, then "there would be no end to the litigation until the ability of the parties or the ingenuity of their counsel were exhausted." Coty, 154 Vt. at 171 (quotation and citation omitted).

¶ 8. NEMG I started its analysis by noting that the Environmental Division had rested its decision on the view that the entire ROA tract was an "undifferentiated whole" for purposes of determining whether there was a preexisting development, as well as for determining whether there had been substantial change, so that rock-crushing activity anywhere on the ROA tract is relevant to show both preexisting development and the absence of substantial change. We held that "we do not take issue with the Environmental Division's broad approach to defining preexisting development." NEMG I, 2015 VT 79, ¶ 24. For a number of reasons, however, we disagreed with the "undifferentiated whole" approach in determining whether there has been a substantial change. We held that

> [O]ur conclusion [is] that some level of granuality (rather than a uniform 'tract-wide' approach) is required in assessing substantial change in connection with quarrying operations … [such that] [p]re-1970 crushing operations on one or more parts of a large tract cannot simply be imputed to all parts of the tract for purposes of the

5

substantial change analysis, without regard to the relative inputs of the pre-and post-1970 operations in the vicinity of the proposed change.

Id. ¶ 30.

¶ 9.    We added, "the deployment of heavy industrial equipment that qualifies as development in a vicinity where it has not previously been deployed is a cognizable change" and concluded "we accordingly reverse the Environmental Division's conclusion that the challenged rock-crushing activity is not a cognizable change."  Id. ¶ 31.

¶ 10.    Our decision went on to conclude that one of the Environmental Division's findings, which supported its conclusion that preexisting development had occurred and that there had been no abandonment of that development, was clearly erroneous.  In light of both errors, our remand instructions were as follows:

> On remand, in light of this opinion and the record evidence, the Environmental Division should revisit its findings concerning whether NEMG's rock-crushing operations fit within the general scope of ROA's pre-1970 development; whether the rock-crushing operations, if established as part of the pre-1970 development, were abandoned; and, whether, if the pre-existing development does include rock-crushing operations generally, NEMG's operations in this case give rise to a substantial change, analyzed consistent with the guidance set forth above.

Id. ¶ 36.

¶ 11.    In this decision, we will focus only on the substantial change issue.  Thus, we assume for purposes of this decision that the Environmental Division on remand properly concluded, based on its findings, that there was a preexisting development that included rock crushing on the ROA tract and that development had not been abandoned.  In narrowing the issues, we recognize that there is some ambiguity in the remand instructions.  Neighbors argue that we held that the first prong of the substantial change test—whether a cognizable physical change to the preexisting development has resulted or may result from the project—was met as a matter of law and was not open to reconsideration on remand.  NEMG argues that, like the other issues in the case, the Environmental Division could reconsider this issue based on new findings and it did

6

this on remand. Although we conclude that neighbors have the better argument, we also conclude that this dispute over the scope of the remand makes no difference to the outcome. Thus, we will look at the Environmental Division's new findings and rationale.

¶ 12. Essentially, the Environmental Division on remand added one finding relevant to the substantial change issue—that, in 1988, ROA signed a contract with a paving company "to remove rock from ROA's grout piles and crush it off-site" and that the contract stated that the paving company had been removing rock for a period of time and that the purpose of the contract was to formalize the practice. From that finding the court drew the inference "that it is common practice in the quarrying industry to conduct crushing without formal contracts." Putting aside that the contract was for removal, with any crushing occurring off-site, rather than for crushing, the finding and the court's inference adds little to its analysis.

¶ 13. Thus, the Environmental Division's action was effectively a reconsideration without new findings of the rationale on which it had found no substantial change in the first instance—in the context of the remand it was an argument that this Court should reconsider its conclusion on substantial change in NEMG I. Although we are open to reconsideration of an ill-considered decision, we note that reconsideration is not within the scope of a remand and our decision in NEMG I was final with respect to this case and these parties. Will v. Mill Condo. Owners' Ass'n, 2006 VT 36, ¶ 9, 179 Vt. 500, 504, 898 A.2d 1264, 1268 ("By ignoring the impact of our holding . . . , the trial court failed to implement the remand order in light of the content of our opinion."); see also Bissonnette v. Wylie, 168 Vt. 561, 562, 711 A.2d 1161, 1163 (1998) (mem.) (holding trial court's reargument of case on remand was "too late" because "if we had accepted that argument, the remand that led to this appeal would have been unnecessary"). Nevertheless, we will address the substance of the remand decision.

¶ 14. In reaching its decision, the Environmental Division looked at precedents involving gravel pits and concluded that under those cases "gravel pits could continue to expand at their historic rates without triggering Act 250 jurisdiction because they were being operated in

7

essentially the same manner as they were before 1970." By contrast, the court noted that "[i]f, however, a gravel pit either dramatically increased its rate of extraction or expanded into a sufficiently distinct portion of a tract, the expansion could be considered a cognizable physical change." Going on to rock crushing, the court found that "just as gravel pits naturally and inherently expand, rock crushing operations are naturally and inherently mobile." Thus, it held that "the relocation of rock crushing operations from one area of a well-developed preexisting quarry to another is consistent with the rock crushing operation's historic pattern of relocation." Specifically, it held that if "crushing has historically occurred on widely scattered, well-developed areas on a tract, a move to yet another (already developed) site, even across natural boundaries and even at significant distances, might still mean the development is 'operated in essentially the same manner as it was before June 1, 1970.'"

¶ 15. The court concluded that the above statement of historical fact characterized the current rock crushing activity: "Movement across significant distances and public highways has always characterized ROA's (or its constituent quarry operators') crushing operations." It found that the current site was already developed because the evidence showed rock crushing occurred on the site a hundred years ago. Its holding that there was no cognizable physical change was as follows:

> In summary, while we do not hold the mere fact that crushing occurred on the NEMG site nearly a century ago to be conclusive in defeating a claim of cognizable physical change, we do hold that crushing at the NEMG site is no more dramatic a relocation than other relocations in ROA pre-1970 history, especially considering that the NEMG site has experienced crushing in the past. We conclude that the present relocation of ROA's crushing to NEMG's site is consistent with the intrinsically portable nature of rock crushing and with ROA's historic pattern of mobile crushing operations. We therefore conclude that the ROA tract is being "operated in essentially the same manner as it was before June 1, 1970," and that no cognizable physical change has occurred.

The court went on to consider the second prong of the substantial change test—whether a cognizable physical change has the potential for significant impact under any of the Act 250

8

criteria—in case we did not accept its conclusion on the first prong. It held that the second prong was also not met because the relocation of crushing to the NEMG site does not cause new impacts; instead, it "simply impacts new neighbors."

¶ 16. The Environmental Division's new rationale, or restatement of its original rationale, reaches the same result essentially for the same reason. As we understand it, the court might reach a different result only in a situation where there had never been rock crushing at the current location or nearby. As we observed above, the mobility of rock-crushing activity on the locations of former rock-crushing activities were included in the court's original findings. For example, the court found that "NEMG's crushing operations have moved around the ROA property over this time [that NEMG has been on the ROA tract]."

¶ 17. We find that the new rationale is inconsistent with our analysis of substantial change in NEMG I. There, we held that a framework that would "cut off the substantial-change analysis at the cognizable-physical-change step", which would in turn disregard the actual change in the impact of proposed development at a site just because similar development had already taken place within the tract is "inconsistent with Act 250's focus on discerning the impact of proposed development." NEMG I, 2015 VT 79, ¶ 26. We explained that "the location of a particular activity or operation within a tract is often inextricably connected to its impact." Id. ¶ 27. We stated our position as follows: "We cannot agree that instances of crushing operations decades ago and miles away from the site of NEMG's present operations can be viewed as establishing some sort of baseline defeating any claim that NEMG's present operations constitute a cognizable change." Id. ¶ 24. The Environmental Division's rationale would take us back to the view that the location of development on the ROA tract is generally irrelevant, a view we explicitly rejected in NEMG I.

¶ 18. Once it has been determined that a cognizable change has occurred, the next step in the substantial change analysis is to determine whether the change has a potential for significant impact under one or more of the statutory Act 250 criteria specified in 10 V.S.A. §§ 6086(a)(1)

9

through (a)(10). In re Hale Mountain Fish & Game Club, Inc., 2007 VT 102, ¶ 4, 182 Vt. 606, 939 A.2d 498 (mem.) (citing Earth Constr., Inc., 165 Vt. at 164, 676 A.2d at 771).

¶ 19. When reviewing Act 250 permit applications, the district environmental commissions and the Environmental Division routinely engage in impact analysis that is location-specific and evaluates the impacts on particular neighbors or households. See, e.g., In re Lathrop Ltd. P'ship., 2015 VT 49, ¶¶ 74–88, 199 Vt. 19, 121 A.3d 630 (analyzing impact of gravel-extraction operations on neighbors by measuring noise in decibels at property line). On remand, the Environmental Division added findings on the impact of the rock-crushing activities on neighboring residents. They show that that the neighbors experience dust, traffic, and noise as a result of the rock-crushing operation. Here, the three impacts demonstrated in the findings correspond to the criteria specified in 10 V.S.A. § 6086(a)(8), "an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." See, e.g., In re Lathrop Ltd. P'ship, 2015 VT 49, ¶ 78. In addition to the adverse effect on aesthetics, the traffic could be seen as causing "unreasonable congestion or unsafe conditions with respect to use of the highways," § 6086(a)(5)(A), while the dust could be "undue water or air pollution." § 6086(a)(1).

¶ 20. This Court has previously held that a development will not have an undue adverse effect on aesthetics if it (1) does not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does not offend the sensibilities of the average person; and (3) takes generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. In re Cross Pollination, 2012 VT 29, ¶ 10, 191 Vt. 631, 47 A.3d 1285 (mem.) (citing In re UPC Vt. Wind, 2009 VT 19, ¶ 24, 185 Vt. 296, 969 A.2d 144). We recognize that there has been no evidence and findings with respect to a clear community standard or with respect to possible mitigation. We are looking here for only potential significant impacts under the relevant criteria. We conclude that the likely effect of the noise and clouds of rock dust on the sensibilities of the average person is

10

significant enough to reach the potential impact as a matter of law and that the second prong of the substantial change test has been met under the trial court's findings.

¶ 21. In reaching this conclusion, we reject the Environmental Division's analysis of why it found the second prong was not met. It concluded that there were no new potential significant impacts under the Act 250 criteria, but only the same impacts on new neighbors, and as a result the impacts could not be considered under the second prong test. The court's evaluation of the second prong follows its analysis of the first prong—that location was not determinative for mobile crushing equipment and activities. For the same reason that we reject that analysis under the first prong, we reject it here.

¶ 22. For the reasons stated above, we reverse the Environmental Division's holding that the NEMG rock-crushing operation is not subject to Act 250 jurisdiction. NEMG is required to submit an Act 250 application and obtain an Act 250 permit to continue its rock-crushing activities.

Reversed.

FOR THE COURT:

_____
Associate Justice


¶ 23. **EATON, J., dissenting**. In my view, the Environmental Division followed this Court's remand instructions and issued a ruling supported by the law and the evidence. In reversing the Environmental Division's decision, the majority—despite stating otherwise— effectively collapses the established two-part substantial-change test and places the burden on North East Materials Group (NEMG), contrary to our law, to prove that its challenged rock-crushing operations are not a substantial change to the preexisting development. Accordingly, I respectfully dissent.

¶ 24. The majority faults the Environmental Division for failing to make significant new findings to support its rationale for its decision following our remand, even though we required

11

the Environmental Division only to "revisit" its findings. In re North East Materials Group LLC Act 250 JO #5-21, 2015 VT 79, ¶ 36, ___ Vt. ___, 127 A.3d 926 [hereinafter NEMG I].  It was manifestly evident in the first appeal that during the two-day evidentiary hearing NEMG had mustered every bit of available evidence of past rock-crushing operations on the Rock of Ages (ROA) industrial complex over the past hundred-plus years—a task made difficult by the long existence of the complex and the lack of record-keeping of those operations in the distant past. Yet, we did not hold that NEMG was required to obtain an Act 250 permit with respect to the challenged rock-crushing operations.

¶ 25.    Rather, we accepted the Environmental Division's "broad approach" of considering the entire complex with respect to determining whether the challenged rock-crushing operations were part of a preexisting development exempt from Act 250, but concluded that a "tract-wide approach" could not be applied in assessing whether those particular operations constituted a substantial change to the preexisting development. Id. ¶¶ 24, 29.  We noted that the Environmental Division had "considered any pre-1970 crushing activity anywhere on the entire 1170 acres owned by ROA as establishing a preexisting development including rock-crushing activities, and as establishing a baseline of rock crushing such that new rock-crushing facilities or operations anywhere on the tract would not constitute a substantial change." Id. ¶ 23 (emphasis in original). We rejected this position with respect to determining whether the challenged rock-crushing operations constituted a substantial change to a preexisting development, stating that it would mean "the absence of prior crushing activity in the vicinity of NEMG's crushing operations would be irrelevant, because previous rock crushing elsewhere on ROA lands, even miles away, could establish a baseline against which NEMG's operations would be measured in a substantial-change analysis." Id. (emphasis added).  We did not "agree that instances of crushing operations decades ago and miles away from the site of NEMG's present operations [could] be viewed as establishing some sort of baseline defeating any claim that NEMG's present operations constitute a cognizable change." Id. ¶ 24 (emphasis added).

¶ 26. Instead, we held that "some level of granularity (rather than a uniform 'tract-wide' approach) is required in assessing substantial change in connection with quarrying operations." Id. ¶ 30. We explained that "similar operations [taking] place prior to 1970 at a different site within the same tract" could be considered, with "factors such as distance between sites and separation by a public highway affect[ing] the weight to be given to the fact of pre-1970 operations at another site within the tract." Id. ¶ 30 n.14; see also id. ¶ 31 ("The deployment of heavy industrial equipment that qualifies as development in a vicinity where it has not previously been deployed is a cognizable change." (emphasis added)).

¶ 27. Accordingly, we did not hold that an Act 250 permit was required. Nor could we have expected that significant new findings on past rock-crushing activities at the ROA site would be forthcoming on remand, given NEMG's exhaustive historical search for evidence concerning such operations. Rather, we remanded the case for the Environmental Division to "revisit its findings," in relevant part, concerning whether "NEMG's operations give rise to a substantial change, analyzed consistent with the guidance set forth" in the opinion. Id. ¶ 36. That guidance, as detailed above, called for a more granular approach, taking into account relative distances from previous rock-crushing operations, in determining whether the challenged operations constituted a substantial change.

¶ 28. That is precisely what the Environmental Division did on remand. The Environmental Division stated that it was revisiting the existing record after the parties—not surprisingly given the thoroughness of the evidence presented in the first evidentiary hearing—declined an opportunity to introduce new evidence. The Environmental Division further indicated that it was supplementing its findings with several facts to "clarify the relative locations of the different historical crushing sites on the ROA tract." In attempting to apply this Court's analysis in NEMG I, the Environmental Division struggled to make sense of our determination that a tract-wide approach could be used in assessing whether the challenged operations were part of a preexisting development but not in determining whether those operations constituted a substantial

13

change to any such preexisting development. Recognizing that this Court directed it to assign appropriate weight to different uses on the ROA tract depending on their location within the tract, and that the fundamental question was whether the preexisting development was being operated in the same manner as before the enactment of Act 250, the Environmental Division concluded that the challenged rock-crushing operations were not a cognizable change from past use.

¶ 29. The Environmental Division found that: (1) the historical quarries formed a north-south line within the ROA industrial complex; (2) there had been rock-crushing operations in the early twentieth century and after 1970 on the challenged site, which is located within the second southernmost of the four quarries; and (3) there had also been pre-1970 crushing operations of at least a similar rate and intensity at the second northernmost quarry approximately 0.8 miles from the challenged site and at the northernmost quarry approximately 1.6 miles from the site. Considering the relative distance between the various rock-crushing operations over the past one-hundred-plus years along the line of quarries within the industrial complex, the Environmental Division concluded that the challenged crushing operations fit squarely within the pattern of crushing operations that had occurred intermittently over many decades before the enactment of Act 250—a pattern of relocating the operations from one area of a preexisting quarry to another as needed depending on where the stone was being extracted. The Environmental Division further concluded that there was no cognizable change in activity because the crushing operations were part and parcel of dimension stone quarrying and were inherently mobile and intermittent in nature.

¶ 30. In short, just as this Court directed, the Environmental Division revisited its findings, adding a few with respect to the specific location of past rock-crushing operations, and took a more granular approach in determining whether there had been a cognizable change with respect to the challenged crushing operations. After carefully considering the extensive record, the Environmental Division concluded—like three different District 5 Environmental Commission coordinators before it—that there was no cognizable change and thus no Act 250 permit was

14

required.  Both the record and the law fully support the Environmental Division's findings, its rationale, and its ultimate conclusion.

¶ 31.  The majority rejects the Environmental Division's new rationale as inconsistent with the substantial-change analysis set forth in NEMG I because it cut off the analysis at the cognizable-change step.  By rejecting the Environmental Division's analysis on this basis, the majority overtly collapses the established two-part substantial-change test, even though this Court explicitly stated in NEMG I, as recognized by the Environmental Division on remand, that we were not collapsing the two prongs of the test into one.  2015 VT 79, ¶ 31 n.16; see In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶¶ 10-11, 181 Vt. 589, 925 A.2d 1006 (mem.) (noting that Environmental Board analyzed potential for significant impacts only after finding that cognizable-change prong had been met); In re F.W. Whitcomb Constr. Co., Declaratory Ruling No. 408, slip op. at 11 (Vt. Envtl. Bd. Aug. 28, 2002), https://perma.cc/WCL7-ARWQ ("Because the Board finds no cognizable physical change, the Board does not go on to determine whether any change has the potential for significant impact under any Act 250 criterion.").

¶ 32.  The majority also effectively imposes upon NEMG the burden of proving no substantial change, while at the same time acknowledging that our law places that burden of proof on the party claiming a substantial change to a preexisting development.  As the majority recognizes, a party seeking to impose Act 250 jurisdiction with respect to a preexisting development has the ultimate burden of showing that there has been a substantial change to the preexisting development.  Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 10.  To be sure, the Environmental Board ruled in past decisions that the holder of the Act 250 exemption has the burden of producing sufficient information on pre- and post-1970 operations to allow the finder of fact to ascertain if a substantial change has occurred.  In re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, slip op. at 14 (Vt. Envtl. Bd. Aug. 30, 1999), https://perma.cc/VG6M-CQQB.  But, as the majority recognizes, this burden of production is placed on the owner/operator of the preexisting

15

development because of the practicality of placing the burden on the party most likely to have that information.  That burden was met here.

¶ 33.  The instant case is far different than those relied upon by the majority, in the sense that NEMG was not withholding information that it should have kept.  Cf. In re John Gross Sand & Gravel, Declaratory Ruling No. 280, slip op. at 11 (Vt. Envtl. Bd. July 28, 1993), https://perma.cc/7C3A-5AXM (stating petitioner's claim that records concerning various businesses were commingled and intertwined did not excuse petitioner "from meeting its burden of production" regarding gravel extraction rates before and after 1970).  Nor is this a situation where the owner/operator of the preexisting development did not disclose the nature of the proposed activity.  Cf. In re Orzel, 145 Vt. 355, 359, 491 A.2d 1013, 1015 (1985) (noting Board's finding that petitioners had no specific proposal for their operation, and stating that Board could not "determine whether some activity constitutes a substantial change to a pre-existing operation unless it is made aware of what that activity is").  Rather, as the Environmental Division found, the lack of extensive information was due to the hundred-year history of the preexisting development and the typical lack of record-keeping for past crushing activities.  The Environmental Division also found that because rock-crushing was "part-and-parcel" with dimension stone quarrying, it "is precisely the kind of activity that might escape formal recording."

¶ 34.  Still, NEMG was able to uncover through a diligent search of historical records, as the Environmental Division found, "impressive evidence of historical rock crushing" supporting the Environmental Division's conclusion that the challenged crushing operations were not a cognizable change from pre-1970 crushing activities occurring intermittently over more than a hundred years on a mile or two line of quarries within the heart of an industrial quarry complex. On the other side, the objecting parties, upon whom the burden of proof of showing a substantial change ultimately rests, produced nothing showing that there had been a substantial change.  As the Environmental Division found, rock crushing has been integrally intertwined with dimension stone quarrying at the ROA complex and has gone on continuously, albeit intermittently, since the

16

early twentieth century. Thus, per this Court's remand instructions, the Environmental Division engaged in a more granular approach, ultimately concluding that the inherently mobile rock-crushing operations had continued intermittently for over a century within a line of quarries that included the site of the challenged rock-crushing operations as well as other locations within less than a mile to about a mile and a half of the site.

¶ 35. The majority has never made it clear what are the parameters of its required "more granular" approach, but apparently, judging from this opinion, NEMG and other companies operating within the ROA industrial complex will now have to obtain a new Act 250 permit for rock crushing every time they move their inherently mobile rock-crushing operations to a new spot in the quarry, despite the evidence of intermittent rock crushing at the NEMG quarrying operations for over a century. Mirabile dictu! That the majority may not agree with the facts as found by the Environmental Division does not mean that those facts found are insufficient or unsupported. The Environmental Division did as they were instructed and reached legal conclusions supported by the facts it found. I would affirm the Environmental Division's decision and therefore I respectfully dissent.

¶ 36. I am authorized to state that Justice Skoglund joins this dissent.

_____
Associate Justice

17