# STATE OF VERMONT

SUPERIOR COURT                                   ENVIRONMENTAL DIVISION

Docket No. 23-3-17 Vtec

---

Mountain Top Inn & Resort
   Jurisdictional Opinion Appeal (#1-391)

---

**Decision on Cross-Motions for Summary Judgment**

This is an appeal from a February 23, 2017, jurisdictional opinion by the District #1 Environmental Commission Coordinator ("Coordinator") concluding that Act 250 jurisdiction is triggered by Mountain Top Inn and Resort's contracted, regular use of ancillary homes.

Appellant Chittenden Resorts, LLC and RMT Associates, d/b/a Mountain Top Inn (collectively "the Resort"), represented by Christopher D. Roy, Esq., now moves for summary judgment. Cross-Appellant Katherine Hall, represented by James A. Dumont, Esq., also moves for summary judgment. We address all pending motions below.

## Legal Standard

This is a de novo appeal. 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). As such, we sit in the place of the District Coordinator, taking evidence anew and developing our own legal conclusions by applying the same substantive standards that the Coordinator was required to apply. Id.

Summary judgment is appropriate where there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law. V.R.C.P. 56(a). When considering the facts on the record, "the nonmoving party receives the benefit of all reasonable doubts and inferences." Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 14, 200 Vt. 125 (quoting Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356). When two or more parties file competing summary judgment motions, "both parties are entitled to these benefits when the opposing party's motion is being judged." Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 48 (1990).

## Material Facts

We recite the following facts solely for the purposes of ruling on the pending motions for summary judgment.

1

1.     The Resort owns and operates the Mountain Top Inn & Resort in Chittenden, Vermont located at 195 Mountain Top Road ("the Resort Property").

2.     While the Resort Property and use thereon predated Act 250, it was required to obtain an Act 250 permit in 1974 with a proposed change of adding lots and an access road.  The Resort subsequently obtained other Act 250 permits and amendments to create multiple lots for private family residences and vacation homes.

3.     The Resort Property is currently subject to Act 250 permit series #1R0166 (the "Resort Permit").

4.     Several residential properties owned independently of the Resort are in the general vicinity of the Resort along Mountain Top Road and other nearby roads (collectively "the Homes").

5.     Some of the Homes are subject to the Resort Permit.  The parties dispute whether some, or all, of the Homes are also on subdivisions that are subject to Act 250 permits separate from the Resort Permit.

6.     Over time, the permit status of the Resort Property and the Homes has become convoluted and confusing, dating back to before the Resort's ownership of the Resort Property.

7.     Different permits and amendments issued at different times to different properties in the area have varying terms and conditions, making both compliance and monitoring challenging for landowners and public officials alike.

8.     To provide clarity, the Resort has been updating all pertinent environmental permits for its own land and operations and has filed an Act 250 application seeking to update the permit applicable to the Resort's own land uses and operations.  The goal is to create a single permit series going forward that is solely applicable to the Resort's lands and operations, thereby clarifying which permit terms and conditions apply to the Resort, and which permit terms and conditions apply to the Homes and other residential subdivisions.[1]

---

[1] One residential subdivision recently constructed by the Resort (known as the Trailside Cottages) is also included as part of the Resort's pending Act 250 application given its relationship with the Resort.

9.	The non-Resort owners of the Homes all own their respective properties in fee simple title and pay all taxes, carrying and maintenance costs associated with ownership of their respective Homes.

10.	Each year, owners of various Homes decide whether to participate in the Resort's short-term rental program ("the Rental Program") under which the Resort administers the check-in and check-out of guests renting the participating Homes (collectively, the "Rental Homes"). The Resort also provides various property management services associated with the arrival of, stay by, and departure of guests to, in and from the Rental Homes.

11.	Owners of the Homes can voluntarily enroll in and withdraw from the Rental Program, on a periodic basis. Therefore, the roster of Rental Homes is constantly subject to change.

12.	Some of the Homes have never participated in the Rental Program. Others have occasionally participated, while the remainder usually participate. Each Rental Home is made available for rental during only a certain number of weeks, with the precise weeks available and the number of weeks varying from Rental Home to Rental Home.

13.	There are currently 23–26 Rental Homes participating in the Rental Program.

14.	The commercial relationship between the Resort and the owners of the Rental Homes is defined by a standardized "Property Rental Agreement" executed by each Home owner wishing to participate in the Rental Program.

15.	Section 1 of the Rental Agreement states that the Agreement continues indefinitely unless and until either party terminates it. Under this section, the Rental Agreement may be terminated by either party at any time, subject to a 30-day notice. Home owners must honor any reservations after this period, if the reservations were confirmed prior to notice of termination. If the Home owner sells the property, the Rental Agreement is automatically terminated on closing, but the individual real estate sales agreement must require the new owner to honor any confirmed reservations made prior to any sales contract.

16.	Section 2 states that the Rental Home owner "employs and appoints" the Resort as the owner's agent "to act exclusively to provide rental, cleaning and management services." Section 2 also conveys to the Resort "all necessary powers, easements and rights of ingress and egress" to provide rental management services.

17.     Section 3 states that the Resort "shall handle all communications and negotiations with tenants with respect to renting" the Rental Homes.

18.     Resort Property amenities that are available to guests of the main Resort Inn are also available to renters of the Rental Homes who have rented through the Rental Program.  These amenities include disc golf on the Resort Property; use of kayaks, canoes, and paddleboards on the Resort Property beach; use of the beach; use of hiking trails, tennis facilities, volleyball facilities, pool, sledding, ice skating, cross-country skiing, snowshoeing, and snowmobiling on Resort Property; horseback riding and clay pigeon shooting on Resort Property (for an additional charge); and dining and spa services (with payment).

19.     The Resort provides housekeeping services for each Rental Home.

20.     Housekeeping services are available during the period when the Homes are available for rental.  These services include general housekeeping, vacuuming, mopping floors, dusting, cleaning dishes, changing linens, trash removal, washing windows, and restocking sundry supplies.  The Resort supplies all household linens at an initial and annual fee to the owner.

21.     The Resort provides property management services for the Rental Homes.  Unlike housekeeping services, property management services are not limited to when Homes are available to rent. These services include snow plowing and removal, firewood purchases, lawn maintenance, landscape gardening, hot tub maintenance, and light maintenance repairs costing less than $500.

22.     The Rental Agreement reserves the right for the Resort to make any repairs, regardless of cost, when in the Resort's judgment, damage to the property is imminent, and the owner cannot be notified in a reasonable period of time.  All repair expenses are deducted from the rent by the Resort.

23.     Rental Home owners are billed seasonally for all property management services.

24.     The Resort provides shuttle services to Rental Home occupants for group events.

25.     The Resort retains a percentage of each rental payment as compensation for services and another percentage as a rental commission.

26.     The Rental Agreement requires Rental Homes to have: a toll-call screened telephone, color TV/VCR, full-strength vacuum cleaner, furniture, furnishings, appliances, cooking and eating

utensils, blankets and pillows, smoke detectors, fire extinguishers, fireplace tools, flashlight, plunger, snow shovel, and other maintenance equipment.

27.     An owner who wishes to stay in his or her own home must make a reservation and obtain a confirmation number, like any of the renters.

28.     The Rental Agreement refers to the Rental Homes as "units."  If the owner fails for any reason to provide the Rental Home in suitable condition, the owner is financially responsible for all the costs of maid service, linens, and paper supplies connected with readying "another unit" for occupancy.

29.     Section 9 of the Rental Agreement requires the Resort to provide liability insurance in the amount of $1 million per occurrence and $2 million in aggregate for the services it provides.  This section also requires the Resort to provide Workers Compensation insurance for all persons engaged in providing the Resort's services.

30.     The Rental Home properties are adjacent to or near the Inn on the Resort Property.

31.     In public advertising on its web page and other sources, the Resort is currently advertised to contain 32 rooms or suites and four "private luxury king cabins and over 20 guest houses of various sizes and styles."

32.     The Rental Agreement describes the Inn as having 40 units.

33.     Information about the various Rental Homes is available on the Resort's website: http://mountaintopinn.com/accommodations/guest-houses/.

34.     Guests at the Rental Homes can check-in and check-out at the Resort Property.

35.     The Rental Homes are advertised on the Killington Resort website and may be booked through Killington Central Reservations ("KCR").  *See* http://www.killington.com/site/plan/all/206041591 and https://bookit.killington.com/Ecomm/Listings/SupplierDetail/2774930/en-US/?supplierid=2020546.

36.     The Resort signs an annual agreement with KCR to rent each individual home based upon availability.  KCR markets each home as either a nightly rental (lodging only), or for multiple days with skiing/rentals included in the package.

5

37. KCR's property management system links directly to the Resort's system. Consequently, when a guest makes a reservation through KCR, it automatically shows up on the Resort's computerized property management system.

38. KCR collects a 100% deposit from the guest at the time of booking and pays the Resort its commission 30 days thereafter. During the available rental periods, housekeeping and maintenance of the Rental Homes is conducted by the Resort.

39. The Resort asserts that, beyond Killington Resort's website, the Rental Homes are, at any given time, also advertised on numerous other websites. Other websites through which potential guests have been able to reserve a Rental Home include Vacation Home (Rentals.com), VRBO/Homeaway, Trip Advisor, Groupon, Living Social, Secret Escapes, Vacations to America (tour operator), Booking.com, Expedia.com, and Airbnb. Cross-Appellant Hall disputes these assertions.

40. The Court is aware of the common practice of owners of second homes located near various Vermont resorts of renting their homes to others for short term rental use, and that various Vermont resorts sometimes administer the rentals of various second homes near their respective resorts.

41. The variable nature of the occupancy of the Rental Homes near the Resort is demonstrated as follows:

   a. In 2016, the number of nights that the individual Rental Homes were occupied by guests ranged from 23 to 223, with some Rental Homes being occupied by the owners as many as 102 nights during the year.

   b. In 2015, the number of nights that the individual Rental Homes were occupied by guests ranged from 53 to 180, with some Rental Homes being occupied by the owners as many as 145 nights during the year.

   c. In 2014, the number of nights that the individual Rental Homes were occupied by guests ranged from 13 to 184, with some Rental Homes being occupied by the owners as many as 63 nights during the year.

42. As many as ten private homes within five miles of the Resort are rented out on a nightly basis by the individual homeowners with no Resort affiliation.

43.     The question of whether Act 250 jurisdiction over the Resort Property extends to the Rental Homes was the subject of a request for a jurisdictional opinion by the Resort dated January 24, 2017.

44.     The District Coordinator concluded in his Jurisdictional Opinion #1-391 dated February 23, 2017 (the "JO") that an Act 250 permit governing the Resort Property would need to be amended so as to encompass all of the Rental Homes as an "expansion of the capacity and uses at the permitted resort facilities." Id. at 1.

45.     The Resort appealed the JO to this Court, commencing the above-captioned appeal (the "JO Appeal").

46.     Meanwhile, in order to clarify the permit status of the Resort Property going forward, the Resort filed a Master Plan application concerning the Resort Property and operation of the Resort (the "Master Application") on July 5, 2017.

47.     Except for the Trailside Cottages, the Master Application left the Rental Homes subject to whatever permits currently bind them, independent of the resort permits.

48.     The Resort acknowledged that, if it were not to prevail in the JO Appeal, it would, at that time, need to apply for an amended Act 250 permit encompassing the Rental Homes. In the meantime, however, the Resort sought to clarify and update the permit status of the Resort Property itself by filing an Act 250 Master Plan Application.

49.     On July 7, 2017, the District Coordinator determined that the Master Application was incomplete and would not be acted upon. The Coordinator explained that he believed that he could not process the Resort's Master Plan Application because of (a) the pendency of the JO Appeal, and (b) the Resort's acknowledgement that any permit issued on the basis of the Master Application would need to be amended to incorporate any Rental Homes deemed to be within the ambit of the Resort Property's Master Permit.

50.     The Resort also appealed this incompleteness determination to this Court (docketed as a separate appeal and assigned Docket No. 87-7-17 Vtec).

**Discussion**

**I. Legal Framework**

There are three ways that a development can trigger Act 250 jurisdiction and be required to obtain an Act 250 permit. First, certain new developments require Act 250 permits. Second, a substantial change to an existing development that predates Act 250 will require a permit. Third, a material change to a development with an existing Act 250 permit will require an amended permit. 10 V.S.A. § 6081.

Regarding the first trigger, an Act 250 permit is required for any "development," which is defined in relevant part as "the construction of improvements on a tract or tracts of land, owned or controlled by a person involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes." 10 V.S.A. §§ 6081(a), 6001(3)(A)(i); Act 250 Rule 2(A).[2]

Here, neither party alleges any "construction of improvements," therefore the relationship between the Resort and Rental Homes does not qualify as a development that would trigger jurisdiction solely on "construction of improvement" grounds.

With respect to the second trigger, a pre-existing development (i.e. a development that predates Act 250) requires an Act 250 permit if there is a <u>substantial change</u> to that development. 10 V.S.A. § 6081(b); Act 250 Rule 2(A), 34(B).

We apply a two-prong test to determine whether a permitted development has undergone a substantial change. <u>In re Request for Jurisdictional Opinion re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A</u>, 2015 VT 41, ¶ 21, 198 Vt. 510. First, there must be a cognizable physical change or cognizable change in use to the pre-existing development. <u>Id</u>., ¶¶ 21–22. Even a modest change may be cognizable if it is recognizable or distinct from what preceded it. <u>In re N. E. Materials Grp. LLC Act 250 JO # 5-21</u>, 2016 VT 87, ¶ 4, 202 Vt. 588. Second—and only if there has been a cognizable change—the change must have "the potential for significant impact under any of the Act 250 criteria." <u>Id</u>.

---

[2] While Act 250 jurisdiction also attaches for certain subdivisions, 10 V.S.A. § 6081(a), subdivision jurisdiction is not relevant to the legal issues raised in this appeal.

Finally, a development that has been permitted under Act 250 requires a permit amendment if there is a <u>material change</u> to that development. Act 250 Rule 34(A).

The analysis to determine if there has been a material change to a permitted use is similar to the substantial change analysis described above. <u>Burlington Int'l Airport</u>, 2015 VT 41, ¶ 25. First, there must be a cognizable physical change or change in use. <u>Id</u>. In the material change analysis, this first step considers whether the change is a departure from what was contemplated in the development's original permit. <u>Id</u>. Second—again, only if there has been a departure— the change must have "the potential for significant impact under any of the Act 250 criteria." <u>Id</u>.

The issue here is whether there has been a substantial or material change, thereby triggering Act 250 jurisdiction, in the Resort's use of the Homes through the Rental Program. We can distill the essential elements to conclude that Act 250 jurisdiction is triggered if there is:

1. A material or substantial change to existing improvements,

2. owned or controlled by a person,

3. on a tract or tracts of land involving more than 10 acres of land within a radius of five miles of any point on any involved land,

4. for a commercial purpose.

## II.   Analysis

Ms. Hall argues in her motion that a new or amended permit is required because (1) the Resort and Rental Home owners are, collectively, a "person;" (2) the Rental Home properties are "involved land;" and (3) the use of the Homes through the Rental Program is a substantial and material change both to the Resort Property's permitted use, and to the use of any Rental Homes previously subject to Act 250 permits.[3]

The Resort argues in its motion that the Resort and Rental Home owners are not a collective "person" who owns or controls the involved land (i.e. the Resort and Rental Home properties) because they are neither (1) a joint venture under 10 V.S.A. § 6001(14)(A)(i); nor (2) affiliated for profit under 10 V.S.A. § 6001(14)(A)(iii).

---

[3] Ms. Hall also focuses significant attention in her filings on the alleged impacts that do or may occur because of the use of Resort facilities by the renters of the Rental Homes. This analysis appears to conflate two separate legal issues: (1) whether the Rental Agreement between the Resort and the Rental Home owners triggers Act 250 jurisdiction; and (2) what Act 250 criteria may govern those impacts.

9

### a. Whether the Resort and Home Owners are collectively a "Person"

Ms. Hall submits that the Resort and those homeowners participating in the Rental Program are collectively a "person" pursuant to Act 250 Rule 2(C)(1)(a) because they have "affiliated with each other for profit, consideration, or any other beneficial interest" through the Rental Agreement; and through this affiliation they have created a material or substantial change, triggering Act 250 jurisdiction. The Resort contends that it and Rental Home owners are not a joint venture under 10 V.S.A. § 6001(14)(A)(i) or affiliated for profit under 10 V.S.A. § 6001(14)(A)(iii).

> "Person" for the purposes of Act 250:
>
> (i) shall mean an individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership;
>
> (ii) means a municipality or State agency;
>
> (iii) includes individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the partition or division of land;
>
> (iv) includes an individual's parents and children, natural and adoptive, and spouse, unless the individual establishes that he or she will derive no profit or consideration, or acquire any other beneficial interest from the partition or division of land by the parent, child or spouse.

10 V.S.A. § 6001(14)(A).[4]

There is no question that the Resort and Home owners are not a "person" under subsections (ii) or (iv).

The Resort asserts in its motion that the Resort and Home owners participating in the Rental Program do not collectively qualify as a person under either subsection (i) or (iii).[5] There is no evidence or allegation that the Resort and Home owners are in any of the more formal legal relationships outlined in subdivision (i).[6] Furthermore, subsection (iii) applies to subdivisions,

---

[4] Section 6001(14)(B) identifies "individuals and entities [that are] presumed not to be affiliated for the purpose of profit, consideration, or other beneficial interest," and therefore not "persons." These exemptions to personhood do not apply to the facts before us.

[5] Ms. Hall does not challenge either assertion or offer any argument that the Resort and Home owners are a person under subsection (i) or (iii).

[6] We note that the Resort asserts that it is not in a joint venture with any of the Home owners and includes an analysis of this legal issue in its motion. Ms. Hall does not challenge this analysis.

and not developments.  This was made clear by the explanation that the Legislature provided when it added the § 6001(14)(A)(iii) definition of person in 1987:

> It is the finding of the general assembly that the state of Vermont is experiencing a significant increase in the number of land subdivisions which are made for speculative purposes; that some of these subdivisions are eroding the natural resource base upon which Vermont's agricultural, forestry, mineral and recreational industries depend; that some of these subdivisions have the potential of imposing significant financial burdens upon local communities providing municipal and educational services; that it is the policy of the state of Vermont to ensure that major subdivision activity within the state comply with the criteria of Vermont's Land Use and Development Law (Act 250), in order to protect the public health, safety and general welfare; and that in order to ensure appropriate Act 250 review, it is necessary to treat persons with an affiliation for profit, consideration, or some other beneficial interest derived from the partition or division of land as a single person for the purpose of determining whether a particular conveyance is subject to Act 250 jurisdiction.

Public Acts, 1987, No. 64, ¶ 1.

The Vermont Supreme Court and the former Vermont Environmental Board have also noted that § 6001(14)(A)(iii) applies to subdivisions, and not developments. [7]  In re Shenandoah LLC, 2011 VT 68, ¶¶ 8, 15, 190 Vt. 149; In re Jesse T. Billings Residuary Tr., DR No. 355, slip op. at 11 (Vt. Envtl. Bd. Jul. 22, 1998) ("[U]se of the § 6001(14)(A)(iii) definition of a person to bind [two parties] as a single person for purposes of applying Act 250's statutory provisions regarding development is not appropriate because Section 6001(14)(A)(iii) applies only to subdivision activity.") (citation omitted).

"Person" is defined differently in the Act 250 Rules.  Under Act 250 Rule 2(C)(1):

(1) "Person" means:

> (a) For the purposes of a "development," person means an individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership; a municipality or state agency; and, individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the "development" of land.

---

[7] The former Vermont Environmental Board was the precursor to the present Natural Resources Board.

(b) For the purposes of a "subdivision," person is defined at 10 V.S.A. § 6001(14)(A).[8]

Ms. Hall submits that the Resort and Rental Home owners are collectively a "person" pursuant to Rule 2(C)(1)(a) because they have "affiliated with each other for profit, consideration, or any other beneficial interest" through the rental agreement. The Resort responds that construing the Rule in this way creates a broader definition of "person" than is set out in the statute, which is impermissible.

The Vermont Supreme Court has noted that the legislature did not intend for Act 250 to "reach all land use changes" in Vermont, and that those administering the Act cannot "enlarge [their] own powers beyond those granted by the Legislature." In re Green Crow Corp., 2007 VT 137, ¶ 12, 183 Vt. 33 (citing In re Agency of Admin., 141 Vt. 68, 76 (1982) ("An administrative agency may not use its rule-making authority to enlarge a restrictive grant of jurisdiction from the legislature.")).

As noted above, § 6001(14)(A)(iii) applies to subdivisions, and not developments. For this reason, in Jesse T. Billings Residuary Tr., the former Environmental Board stated that it is "not appropriate" to use the definition of a person in § 6001(14)(A)(iii) for developments. DR No. 355, slip op. at 11 (Jul. 22, 1998). Rule 2(C)(1)(a) purports, however, to do just that.

We therefore conclude that we are unable to apply Rule 2(C)(1)(a) because it would impermissibly expand Act 250 jurisdiction beyond what the Legislature has authorized.

Alternatively, even if Rule 2(C)(1)(a) applies, the Resort and Rental Home owners do not qualify as a "person" under the Rule.

As explained above, Act 250 jurisdiction extends to "developments," or material or substantial changes to existing developments. A development is an improvement on a tract or tracts of land owned or controlled by a person. 10 V.S.A. § 6001(3)(A)(i); Act 250 Rule 2(C)(12). Pursuant to these statutes and rules, a "development" is comprised of an improvement on land—

---

[8] This Rule was first added to the former Environmental Board Rules as Rule 2(H)(1), in nearly identical form, in 2003. See http://www.state.vt.us/nrb/lup/publications/rules/2003rules.pdf. Prior to that, Environmental Board Rule 2(H) simply read: "'Person' is defined at 10 V.S.A. § 6001(14)(A) and (B)." Environmental Board Rules, effective January 18, 2001, http://nrb.vermont.gov/sites/nrb/files/documents/2001rules.pdf.

either a single piece of land or separate, non-contiguous pieces of land—owned or controlled by a person.

Here, even if the Resort and each individual Rental Home owner collectively exercise control over each individual Rental Home, the Rental Home owners exercise no control over the Resort Property. Furthermore, while the Resort enters into individual Rental Agreements with each individual Rental Home owner, the evidence presented does not suggest that those individual owners have any joint contractual or other relationship concerning each other's property. Lastly, there has been no evidence presented that the Resort Property and the Rental Homes are collectively controlled by the Rental Home owner and the Resort. We therefore conclude that these entities are not collectively a "person" under Rule 2(C)(1)(a).

### b. Whether the Resort is a person that owns or controls the Resort and Rental Homes

While the motions focus on whether the Resort and Rental Home owners are collectively a "person" that owns or controls the Rental Homes, a precursor question that is also raised in the filings is whether the Resort, alone, controls the Rental Homes for Act 250 purposes.[9] We therefore look to whether the Resort alone controls the Rental Homes through the Rental Agreement.[10]

First, we note an undisputed preliminary matter: no party asserts that the Resort has an ownership interest in the Rental Homes. We therefore focus our analysis on whether control has been established.

"Control" for the purposes of determining Act 250 jurisdiction, like other terms in administrative regulations, is afforded its plain meaning. In re Vitale, 151 Vt. 580, 584 (1989) (citation omitted). The dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting

---

[9] This issue is set out in Question 1 of the Resort's Statement of Questions and raised in Ms. Hall's April 3, 2016 Response to the Resort's motion for summary judgment.

[10] The District Coordinator concluded that both the Resort and the Home owners are the same "person" for purposes of control. However, the Coordinator later states in his jurisdictional opinion that the Resort alone controls the Homes. In our de novo review, "the case is heard as though no action whatever has been held prior thereto." In re Poole, 136 Vt. 242, 245 (1978). Therefore, the Court is not bound by the decision below and is in fact directed to proceed "as though no decision had been previously rendered." Id.

13

securities, by contract, or otherwise; the power or authority to manage, direct, or oversee." Black's Law Dictionary (10th ed. 2014).

A developer can exercise control over land for Act 250 purposes through, for example, a purchase and sale agreement; a lease agreement, as in In re Sugarbush Resort Holding, Inc., No. 5W1045-15-EB, slip op. at 8–9 (Vt. Envtl. Bd. Aug. 12, 1997); or a perpetual easement, as in Wesco, Inc. & Jacob & Harmke Verburg, DR #304 (Vt. Envtl. Bd. Dec. 7, 1995).

It is less clear whether a contractual arrangement like the Rental Agreement results in "control" for Act 250 jurisdictional purposes. The parties direct us to no cases addressing this issue.

One case that we have found which does address this question, to some extent, is In re Ochs, 2006 VT 122, 181 Vt. 541. The issue in that case was whether the operators of an apple packing facility "controlled" the farms from which they imported their apples to a sufficient degree to qualify for the Act 250 farming exemption at 10 V.S.A. § 6001(22). 2006 VT 122, ¶ 2. Ochs is, in a way, the mirror image of the case now before us: here, if the Rental Homes are controlled by the Resort, then jurisdiction attaches to the Rental Homes. In Ochs, if the outlying farms were controlled by the packing facility owners, the farming exemption applied, and jurisdiction did not attach.

The Supreme Court explained that the packing facility owners, the Ochses:

[E]xercise sufficient control over the lands which they lease to bring those lands into their farm for purposes of 10 V.S.A. § 6001(22)(E). They make the day-to-day decisions concerning the apple cultivation at the leased orchards. Using their own machinery, they do all of the work on the lands and trees at the leased orchards; they prune and spray, and they pick the apples. Neither lessors nor any person other than the Ochses work on the leased orchards lands during the lease period. The lessors exercise no control over the Ochses' operations.

Id., ¶ 14.

The case now before us is similar in some ways to Ochs. The Resort manages day-to-day use of Rental Homes by controlling bookings. The Resort also does much of the day-to-day work at the Rental Homes, including housekeeping and maintenance.

On the other hand, the degree of use and control by the Resort here is less than in Ochs. The "work" done by the Resort at the Rental homes (housekeeping and maintenance) is limited

in time, while the Rental Homes are managed and controlled exclusively by their respective owners when they are otherwise occupied by non-Resort renters and their owners.

In addition, the Rental Home owners retain more control than did the lessors in Ochs. Apart from linens, the Home owners provide the "equipment" to be used in the Rental Homes (i.e. toll-call screened telephone, color TV/VCR, full-strength vacuum cleaner, furniture, furnishings, appliances, cooking and eating utensils, blankets and pillows, smoke detectors, fire extinguishers, fireplace tools, flashlight, plunger, snow shovel, and other maintenance equipment). The Home owners can "book" their own Rental Homes for rental to others or for personal use, separate from the Resort, for apparently unlimited amounts of time. The Home owners can terminate the Rental Agreement at any time, or can sell the Homes at any time, which automatically terminates the Rental Agreement. A Home owner could therefore enter into a Rental Agreement with the Resort, and then immediately give notice to terminate. In this scenario the Resort would exercise limited control over the Home for a very short time.

With the analogous guidance provided by our Supreme Court in their Ochs decision, we conclude that the Resort alone does not exercise sufficient control over the Rental Homes to meet the definition of a "person" that exercises control over the Rental Homes for the purposes of Act 250 jurisdiction.

In light of our analysis and conclusions that the Resort and Rental Homes are not owned or controlled by the same "person" for Act 250 jurisdictional purposes, we enter judgment in the Resort's favor. This conclusion also forecloses our review of the remaining legal issues raised by Ms. Hall in her summary judgment motion, including her legal assertions that the Rental Agreement may cause increases to the impacts that may be caused by the operation and use of the Resort.[11]

---

[11] As we noted above, to trigger the need for an amended Act 250 permit application, an existing development must have undergone a "significant change." 10 V.S.A. § 6081(b); Act 250 Rule 2(A), 34(B). To be regarded as "significant," a change in a development or its use must be recognizable or distinct from what the prior permit authorized—and only if there has been a cognizable change—the change must have "the potential for significant impact under any of the Act 250 criteria." In re N. E. Materials Grp. LLC Act 250 JO # 5-21, 2016 VT 87, ¶ 4, 202 Vt. 588.

**Conclusion**

For all the above reasons, we conclude that neither the Resort alone, nor the Resort and Rental Home owners collectively, is a "person" who owns or controls the Rental Homes and Resort for the purposes of Act 250 jurisdiction. Therefore, neither the Resort alone, nor the Resort and Rental Home owners collectively, need to obtain a new or amended Act 250 permit due to the Rental Agreement entered into by and between the Resort and the individual Rental Home owners.[12] Having reached this conclusion, we **GRANT** the Resort's summary judgment motion and **DENY** Ms. Hall's motion.

This concludes the matter before the Court. A Judgment Order accompanies this decision.

Electronically signed on August 22, 2018 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____

Thomas S. Durkin, Superior Judge
Environmental Division

---

[12] Importantly, this conclusion has no bearing on whether any Act 250 permits that cover the Rental Homes separate from the Resort Property must be amended due to Home owner's participation in the Rental Program.