VERMONT SUPERIOR COURT

Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

Docket No. 23-ENV-00043



| | |
|---|---|
| **Julian Materials, LLC JO Appeal** | **DECISION ON MOTIONS** |

This is an appeal of a Jurisdictional Opinion (#2-324), and subsequent denial of reconsideration, issued by the Act 250 District #2 Coordinator on March 6, 2023 and April 20, 2023, respectively, concluding that an Act 250 permit amendment to Land Use Permit Series #2S0775 is required for Julian Materials, LLC's ("Julian") quarrying activities at three quarries in Chester, Vermont. A group of neighboring property owners—Barry Goodrich, Gregory Goodrich, James Goodrich, Scott Kilgus, Cheryl and Michael Leclair, Karen and Robert Macallister, Michael McCarthy, Patricia and Rene Melanson, John Nowak, Leslie Thorsen, and James and Kay Wells (together "Neighbors")— intervened as interested persons and seek to uphold JO #2-324. Presently before the Court is the NRB's motion for summary judgment. Julian opposes the motion. All of the Neighbors also request summary judgment by adopting the statement of material facts and legal arguments presented on behalf of the NRB. In addition, neighbors Leslie Thorsen and Scott Kilgus move for an expedited trial. For the reasons set forth herein, the NRB's and Neighbors' summary judgment motions are **GRANTED** and the motion for an expedited trial is therefore **MOOT**.

Julian, together with its fellow quarry owners (137 Chandler Road, LLC, and 3643 VT Route 103 N, LLC) are represented in these proceedings by Attorney Mark G. Hall, Esq. Neighbors Barry Goodrich, Gregory Goodrich, James Goodrich, Cheryl and Michael Leclair, Karen and Robert Macallister, Michael McCarthy, Patricia and Rene Melanson, John Nowak, and James and Kay Wells are represented in these proceedings by Attorney Stephen S. Ankuda, Esq. Neighbors Scott Kilgus and Leslie Thorsen are represented here by Attorney James A. Dumont, Esq.

## Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). When considering a motion for summary judgment, the nonmoving party receives the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. In determining whether there is any dispute over any material fact, "we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted); V.R.C.P. 56(c)(1)(A). It is with these standards in mind that we review the pending summary judgment motion.

## Factual Background

We recite the following factual background and procedural history, which we understand to be undisputed unless otherwise noted, based on the record now before us and for the purpose of deciding the pending motion. The following are not specific factual findings relevant outside the scope of this decision on the pending summary judgment motions. See Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (citing Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.)).

1. Julian Materials, LLC (previously defined as "Julian") owns and operates three dimensional stone quarries in Chester, Vermont (the North, South, and Chandler Quarries).

2. The North Quarry is located at VT Route 103 North on a ±343-acre parcel.

3. The South Quarry (historically known as Allstone Quarry) is located on the same parcel as the North Quarry, approximately 2,900 feet from the North Quarry.

4. The Chandler Quarry is located on an 8.5-acre parcel at 137 Chandler Road.

5. The entrance to the Chandler Quarry is 1.7 miles from the South Quarry entrance via VT Route 10.

6. In July 1988, the Act 250 District #2 Environmental Commission issued Land Use Permit #2S0775 which authorized rock extraction from the North Quarry at an average rate of 100 to 500 tons per week. NRB Exhibit 4.

7. Condition 1 of LUP #2S0775 explains that "[t]he project shall be completed, operated and maintained as set forth in Findings of Fact and Conclusions of Law #2S0775…" Id. at ¶ 1.

8. Condition 11 of LUP #2S0775 provides: "This permit shall expire on July 15, 2008, unless extended by the District Environmental Commission." NRB Ex. 4 at ¶ 11.

9. In June 2005, the District Commission issued LUP #2S0775-1, which authorized the development of the South Quarry and the phasing out of the North Quarry. NRB Ex. 12.

10. LUP #2S0775-1 and the associated Findings of Fact and Conclusions of Law contained the following provisions with respect to noise and drilling operations:

   a. "The permittees shall not blast or drill on Saturdays." Id. at ¶ 12.

   b. "The permittees shall limit drilling to twenty hours per month." Id. at ¶ 19.

   c. "The permittees shall not increase the Lmax noise levels above 55 dBA at the houses along Route 103 for more than 3% of the time (76% of the total time) during normal operations and not more than an additional 15% of the time (88% of the total time) during drilling. Id. at ¶ 23.

   d. "The Applicants will use a hydraulic drill, an excavator, a 70-ton rock splitter, a loader moving metal hoppers, a generator and a 300-ton rock splitter." NRB Ex. 13 at ¶ 47.

   e. "The hydraulic drill is expected to be the loudest piece of equipment. The loudest noise would be heard when the drill bit begins to penetrate the rock surface. As the drill gets deeper, noise levels slowly drop." Id. at ¶ 48.

11. Neither permit contemplates hydraulic hammering as a piece of operational equipment.

12. Between May 30, 2020 and January 2, 2023, the NRB received noise complaints about hydraulic hammering operations at the South Quarry and the North Quarry. NRB Ex. 2.

13. Rock hammers and rock drills emit similar levels of sound in terms of decibels. Julian Ex. 1 at 3.

14. In order to mitigate the sound levels from rock hammering at the South Quarry, Julian proposes using a portable noise barrier. Id. at 1.

15. A portable noise barrier was not a condition to mitigate noise in any previous permit for the quarries.

16. The Findings of Fact and Conclusions of Law associated with both LUP #2S0775 and #2S0775-1 contain the following findings with respect to closure and reclamation of the North Quarry:

   a. "Preliminary reclamation has begun at the [North Quarry]. The Applicants expect the [North Quarry] will be fully reclaimed and closed by 2008." NRB Ex. 13 at ¶ 3.

   b. "The Applicants own a permitted dimension quarry on the northwest of this tract of land, approximately 2,900 feet away. This quarry will be phased out of production over two years as the new quarry is developed." Id. at ¶ 33.

c. "The quarry design provides a sequentially excavated series of benches and lifts that will be reclaimed with soil saved from the excavation of each bench. The applicant will reclaim each bench sequentially and will use native trees, seeding and mulching in accordance with the plans described in the exhibits…" NRB Ex. 5 at ¶ 4(c).

d. "The applicant has designed an excavation procedure and a reclamation plan in conjunction with the requirements and suggestions of the state geologist. . . . In conjunction with the Agency of Natural Resources Landscape Architect's recommendations, the applicant will replant the site with indigenous trees of about six feet in height as per the planting plan . . . . Six inches or more of soil saved from the quarrying and additional topsoil will be used to help plants get started. Each lift and bench will be seeded, planted, mulched, and maintained as the sequential excavation proceeds. This will enable the project to begin reclamation after the first bench is excavated." Id. at ¶ 8(c).

17. There are ongoing quarrying operations occurring at the North Quarry, including: "the extraction of rock from the quarry and rock hammering. Extraction involves drilling, blasting, excavating, and hauling of material. The extracted material is currently hauled to the Chandler Road Quarry for additional processing." Julian Ex. 2 at 3.

18. The North Quarry has not been fully reclaimed.

19. On June 11, 2009, the Act 250 District 2 Coordinator issued Jurisdictional Opinion #2-263 concluding that the Chandler Quarry was a pre-existing development that was not subject to Act 250 jurisdiction. NRB Ex. 17 (JO #2-263) at 2.

20. At the time that JO #2-263 was issued, Julian was not the owner of the Chandler Quarry.

21. Julian subsequently acquired Chandler Quarry and has operated it as a quarry since July 1, 2013.

22. Julian uses the Chandler Quarry in conjunction with the North and South Quarries by trucking stone from the North and South Quarries to Chandler Quarry for processing. NRB Ex. 21 at 2.

23. In August 2023, Julian submitted a Conditional Use Permit application to the Town of Chester Development Review Board ("DRB") seeking local zoning permits for future operations at all three quarries.

24. In January 2024, Julian withdrew its Conditional Use Permit application.

## Statement of Questions

In the Environmental Division, the Statement of Questions provides notice to other parties and this Court of the issues to be determined within the case and limits the scope of the appeal. In re Conlon CU Permit, No. 2-1-12 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Aug. 30, 2012)

(Durkin, J.). As filed, the Statement of Questions presents the following Questions for the Court's review:

> 1.      Whether . . . [the] intermittent use of a hydraulic hammer at the South Quarry requires an Act 250 amendment to LUP 2S0775-1?
>
> 2.      Whether an Act 250 permit amendment to LUP 2S077[5] or LUP 2S077[5]-1 is required to reclaim the North Quarry?
>
> 3.      Whether the 2008 expiration date for LUP 2S0775 was extended to October 1, 2025 by LUP Amendment 2S0775-1?
>
> 4.      Whether removal of stone is permissible as part of the reclamation plan for the North Quarry under LUP 2S0775 and 2S0775-1?
>
> 5.      Whether the Chandler Quarry is exempt from Act 250 as a pre-existing use?
>
> 6.      Whether the operations of Julian Materials, LLC at Chandler Quarry constitute a substantial change to a pre-existing use?

Julian Statement of Questions, filed on September 25, 2023, at 1.

## Discussion

### I.      Question 1: Hydraulic Hammering

Question 1 asks whether the use of a hydraulic hammer at the South Quarry requires an Act 250 permit amendment. Pursuant to Act 250 Rule 34(A), "[a] permit amendment shall be required for any material change to a permitted development…." Act 250 Rule 34(A). A material change is defined as "any cognizable change to a development… which has a significant impact on any finding, conclusion, term or condition of the project's permit or which may result in a significant adverse impact with respect to any of the criteria specified in 10 V.S.A. § 6086(a)(1) through (a)(10)." Act 250 Rule 2(C)(6).

The Court applies a two part test to determine whether there has been a material change to a permitted use. Mountain Top Inn & Resort, No. 23-3-17 Vtec, slip op. at 8 (Vt. Super. Ct. Envtl. Div. Aug. 22, 2018) (Durkin, J.), *aff'd* 2020 VT 57. First, there must be a cognizable change in use from what was contemplated in the development's original permit. Id. "Even a modest change may be cognizable if it is recognizable or distinct from what preceded it." Id. (citing In re N.E. Materials Grp. LLC Act 250 JO # 5-21, 2016 VT 87, ¶ 4, 202 Vt. 588. Second, the change must have "the potential for significant impact under any of the Act 250 criteria." Id. (citation omitted).

Julian argues that it does not need to seek a permit amendment in order to use a hydraulic hammer because there is no express prohibition against hydraulic rock hammering in LUP

#2S0775- 1. Julian also suggests that because the noise from rock hammering is slightly less than that from drilling, the change in equipment is de minimis and therefore not material. Julian's argument misconstrues the material change analysis outlined above. This test requires the Court to determine whether a change in use is cognizable, and if so, whether the change has the potential to significantly impact any of the Act 250 criteria. This test does not, however, ask the Court to compare an unpermitted change in use to the previous permitted use to determine whether the change is de minimis.

Applying the material change test to Julian's use of a hydraulic rock hammer leads to the conclusion that a permit amendment is necessary. First, the change from drilling to hammering is a cognizable change from what was contemplated in the original permit.[1] LUP #2S0775-1 states that "[a]pplicants will use a hydraulic drill, an excavator, a 70-ton rock splitter, a loader moving metal hoppers, a generator and a 300-ton rock splitter." NRB Ex. 13 at ¶ 47. There is no mention of hydraulic hammering anywhere in LUP #2S0775-1. Accordingly, this is a cognizable change from the terms of the permit.

Second, hydraulic hammering has the potential to significantly impact at least one, if not more, Act 250 criteria. LUP #2S0775-1 contains several conditions with respect to Criterion 8, Aesthetics, specifically regarding impacts of noise. The permit imposed strict limitations on drilling operating hours and maximum noise levels in order to satisfy Criterion 8. Julian's proffered evidence that hydraulic hammering has comparable noise levels to drilling leads the Court to conclude that this change in use has the potential to significantly impact Criterion 8. This is because Julian's own noise assessment suggests that additional noise mitigation, such as using a portable noise barrier, is needed to reduce the sound levels from hydraulic hammering. For all these reasons, we conclude that Julian's use of a hydraulic hammer requires a permit amendment. Thus, the material facts are not in dispute and the NRB is entitled to judgment as a matter of law on Question 1.

## II.     Questions 2, 3, and 4: Operations at the North Quarry

In order to answer Questions 2 and 4, we must first address Question 3, which asks whether the 2008 expiration date for the North Quarry was extended to October 1, 2025 by virtue of LUP #2S0775-1. We conclude that it was not.

---

[1] We note that the NRB began receiving complaints of hydraulic hammering in May 2020 through January 2023. Thus, as a practical matter, it appears that the evidence presented to us is undisputed that the change in machinery was cognizable to those in the area and the existing permit conditions were insufficient to mitigate the impacts thereof.

This Question, and Julian's arguments against the pending motion, ask the Court to ignore the plain language of both permits. When construing permit conditions, we apply the established rules of statutory interpretation. Agency of Nat. Res. v. Weston, 2003 VT 58, ¶ 16, 175 Vt. 573. We begin by looking at the plain meaning of the words used by the drafters to determine their original intent. Id. If the plain meaning of the language is clear, we "accept[ ] the plain meaning of the words because we presume that they express the underlying intent." Id. Lastly, the Court looks at the permit "as a whole, and, if possible, gives effect to every word, clause, and sentence." State v. Tierney, 138 Vt. 163, 165 (1980) (citing State v. Mahoney, 122 Vt. 456, 459 (1961).

Both permits contemplate the phasing out of the North Quarry in or around 2008. Condition 11 of LUP #2S0775 provides that "[t]his permit shall expire on July 15, 2008, unless extended by the District Environmental Commission." NRB Ex. 4 at ¶ 11. This expiration date was later incorporated into LUP #2S0775-1, issued in June 2005, which explained that the North Quarry "will be phased out of production over two years as the [South Quarry] is developed." NRB Ex. 13 at ¶ 33. The permit also included a finding which says that "[p]reliminary reclamation has begun at the [North Quarry]. The Applicants expect the permitted site will be fully reclaimed and closed by 2008." Id. at ¶ 3. Thus, the permits clearly both contemplate the closure of the North Quarry in 2008, to coincide with development of the South Quarry.

Julian asks us to ignore these findings of fact and hold that Condition 25 of LUP #2S0775-1, which provides that "[t]his permit shall expire on October 1, 2025", applies to both the North and South Quarries. We decline to adopt Julian's siloed interpretation of Condition 25 as it would lead to an absurd result of ignoring the multiple instances in the permits which contemplated the North Quarry would be reclaimed by 2008. See Billewicz v. Town of Fair Haven, 2021 VT 20, ¶ 26, 214 Vt. 511, 524 (explaining that statutes should not be interpreted to produce absurd or irrational results). Rather, based on the plain language of both permits as a whole, we conclude that the North Quarry should have ceased operations and been reclaimed in 2008 to coincide with development of the South Quarry. Accordingly, continued quarrying operations after this date and any future reclamation of the North Quarry is a material change from the terms of the original and amended permits and therefore requires a permit amendment. As such, we answer Question 3 in the negative.

We next turn to Questions 2 and 4, which ask whether a permit amendment is necessary to reclaim the North Quarry,[2] and whether removal of stone from the North Quarry is permissible as

---

[2] Julian argues that the reclamation provisions in either permit, and the NRB's citation to related exhibits, are merely aspirational statements rather than binding conditions. However, approval of a site rehabilitation plan is a necessary

part of the reclamation plan.[3]  For the same reason as discussed in response to Question 3, the continued operations at the North Quarry, in any capacity, requires a permit amendment because neither permit contemplated activities in the North Quarry beyond 2008.  By extension, any future reclamation plans or activities at the North Quarry must also require a permit amendment because the quarry was supposed to cease operations more than 15 years ago.

Reclamation of the North Quarry was required as a condition of both permits, and the inclusion of a reclamation plan was necessary for compliance with Act 250 Criterion 9(E).  10 V.S.A. § 6086(a)(9)(E)(ii) ("A permit will be granted for the extraction or processing of mineral and earth resources… [u]pon approval by the District Commission of a site rehabilitation plan that ensures that upon completion of the extracting or processing operation the site will be left by the applicant in a condition suited for an approved alternative use or development.").  Despite the long overdue requirement to reclaim the North Quarry, Act 250 jurisdiction still attaches to the Property, and Julian's failure to abide by the reclamation provisions of the original permit requires them to seek a permit amendment for approval of future reclamation activities.  See In re Hamm Mine Act 250 Jurisdiction, 2009 VT 88, ¶ 7, 186 Vt. 590 (explaining that mine operators were required to seek a permit amendment after failing to abide by the original permit's rehabilitation provisions despite the cessation of mining operations and expiration of the original permit); compare with In re Huntly, 2004 VT 115, 177 Vt. 596 (holding that Act 250 jurisdiction no longer applied to a property which had fully satisfied its permit conditions, including those pertaining to reclamation and rehabilitation).  Accordingly, any extension of deadlines for the reclamation of the North Quarry, and any modification of those provisions, requires Julian to first seek a permit amendment.  Accordingly, we answer Question 2 in the affirmative and Question 4 in the negative.   Thus, the material facts are not in dispute and the NRB is entitled to judgment as a matter of law on these Questions.

### III.  Questions 5 and 6: Operations at the Chandler Quarry

Lastly, we turn to Questions 5 and 6, which ask whether the Chandler Quarry is exempt from Act 250 as a pre-existing use, and whether Julian's activities at the Chandler Quarry constitute a substantial change to a pre-existing use requiring a permit.  There is no dispute among the parties that,

---

permit requirement for quarrying operations.  10 V.S.A. § 6086(a)(9)(E)(ii).  Accordingly, the reclamation requirements, including timeframes, that are incorporated into Julian's permits, are binding conditions rather than aspirational statements.

[3] In its application for a conditional use permit, Julian proposed to convert the North Quarry into a contractor yard for storage of materials, equipment, and miscellaneous items.  Julian concedes that this use requires a permit amendment because it is a material change from either permit. In any event, Julian withdrew this conditional use permit application at the municipal level.

fully independently from the North and South Quarries, the Chandler Quarry is not a "development" under Act 250 because it falls below the 10-acre threshold for towns with permanent zoning regulations. See 10 V.S.A. § 6001(3)(A)(i) (defining "development" as "[t]he construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land…").[4] It is also undisputed that use of the Chandler Quarry pre-existed Act 250. Therefore, the relevant inquiry is whether Julian's ownership and operations of Chandler Quarry constitute a substantial change to a pre-existing development, such that Julian must seek a permit amendment.

Act 250 requires a permit when there has been a substantial change to a pre-existing development. Act 250 Rule 34(B). "Substantial change" is defined as "any cognizable change to a pre-existing development or subdivision which may result in significant adverse impact with respect to any of the criteria specified in 10 V.S.A. § 6086(a)(1) through (a)(10). Act 250 Rule 2(C)(8). The Court applies a two-part test to determine whether a substantial change has occurred. Mountain Top Inn & Resort, No. 23-3-17 Vtec, slip op. at 8 (Vt. Super. Ct. Envtl. Div. Aug. 22, 2018) (Durkin, J.), aff'd 2020 VT 57. "First, there must be a cognizable physical change or cognizable change in use to the pre-existing development." Id. (citation omitted). "Second—and only if there has been a cognizable change—the change must have 'the potential for significant impact under any of the Act 250 criteria.'" Id. (citing In re N.E. Materials Grp. LLC At 250 JO, 2016 VT 87, ¶ 4, 202 Vt. 588).

Based on the undisputed facts presented, we conclude that Julian's operations at the Chandler Quarry constitute a substantial change to a pre-existing development, thereby necessitating an Act 250 permit application and approval. Julian operates the Chandler Quarry in conjunction with the North and South Quarries by trucking stone from the latter two Quarries to the Chandler Quarry for processing and splitting. These coordinated operations were observed by an NRB enforcement officer and documented in complaints received by the NRB between May 30, 2020 and January 2, 2023. The trucking between quarries and ongoing quarrying operations have the potential to significantly impact Act 250 Criteria 5 (traffic), 8 (noise and aesthetics) and 9(E) (processing of mineral and earth resources). See Dorr et al Earth Extraction Appeal, No. 124-9-13 Vtec, slip op. at 7 (Vt. Super. Ct.

---

[4] Julian concedes that the Chandler Quarry is no longer categorically exempt from Act 250 because of its affiliation with the North and South Quarries and Julian's ownership of all three locations. Julian Materials, LLC's Memorandum in Opposition at 15, filed January 12, 2024. Julian's acquisition of the Chandler Quarry rendered the Chandler Quarry subject to Act 250's definition of development. Previously, the amount of involved land at Chandler Quarry was only 8.7 acres, which fell below the 10-acre threshold for towns with duly adopted zoning regulations. However, because the Chandler Quarry is less than five miles from the North and South Quarries, and all three quarries are under common ownership, the amount of involved land exceeds 300 acres, far above the 10-acre threshold.

Envtl. Div. Oct. 10, 2014) (Walsh, J.) (explaining that in the Act 250 context, increases in extraction rates, truck traffic, or the type of equipment used may result in a significant impact under the Act 250 criteria and therefore requires a permit amendment) (citing In re Barlow, 160 Vt. 513, 522-23) (1993)). Put simply, the Chandler Quarry was, prior to Julian's ownership and use in relation to the North and South Quarries, an independent quarry. It is now a part of a group of quarries and is used as a processing and splitting location for materials extracted from the North and South Quarries. These changes are cognizable and have the potential to significantly impact various Act 250 criteria.

For these reasons, we conclude that the material facts are not in dispute and the NRB and Neighbors are entitled to judgment as a matter of law on Questions 5 and 6. In so concluding, Julian's operations at the Chandler Quarry, in conjunction with North and South Quarries, requires a permit amendment application and approval.

**Conclusion**

For the foregoing reasons, we conclude that there is no genuine dispute of material fact regarding Julian's operations at the North, South, and Chandler Quarries, such that these activities require Julian to seek a permit amendment. Accordingly, we **GRANT** the NRB's and the Neighbors' motions for summary judgment on all six Questions. As a result, Neighbors' motion for an expedited trial is **MOOT**.

This concludes the matter before the Court. A Judgment Order accompanies this Decision.

Electronically signed at Newfane, Vermont on Thursday, March 21, 2024, pursuant to V.R.E.F. 9(d).

Thomas S. Durkin, Superior Judge
Superior Court, Environmental Division